In re Joseph C. STEINKRAUSS and Donna E. Steinkrauss, Debtors.

Joseph C. Steinkrauss and Donna E. Steinkrauss, Plaintiffs,

v.

United States of America, Defendant.

Bankruptcy No. 97–19549–WCH.
Adversary No. 98–2210.

United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

July 8, 2004.

Jeffrey J. Cymrot, Sassoon and Cymrot, Boston, MA, for Debtors and Plaintiffs.

Timothy M. Mauser, Mauser & Mauser, Boston, MA, for Debtors.

Harold B. Murphy, Hanify & King, P.C., Boston, MA, for trustee.

Edward DeFranceschi, Boston, MA, for Plaintiffs.

Alejandro L. Bertoldo, Carina J. Campobasso, Trial Attorney, Tax Division, US Department of Justice, Washington, DC, for Defendant.

### MEMORANDUM OF DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

#### I. *Introduction*

Joseph C. Steinkrauss and Donna E. Steinkrauss ("Joseph", "Donna", and collectively the "Debtors") brought this adversary proceeding against the United States of America ("United States") to determine the amount and dischargeability of their federal income taxes for the years 1986 through 1993 inclusive. The IRS countered that the Debtors willfully attempted to defeat payment of their taxes for those years by failing to file returns and pay taxes for those years, other than the payment of an occasional erroneous estimated tax payment, until 1995. By the time of trial, the parties had agreed upon the amount of taxes, penalties, and interest due at the time of the filing of the petition and that the remaining issue is whether those amounts are dischargeable under 11 U.S.C. § 523(a)(1)(C).[1] I held a two day trial and the parties filed several post-trial briefs. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I). Based upon the following findings of fact and conclusions of law, I will enter a separate order in favor of the United States.

#### II. *Background*

##### A. The Debtors

Joseph served in active duty in Vietnam and then worked in intelligence for the United States Navy. He attended law school and received his law degree in 1969. After working at Raytheon Corporation during and after law school, he became inhouse counsel at Converse Rubber Company and worked there for approximately twelve years. While at Converse he concentrated on labor and employment law and then moved to corporate law where his

---

1.

    A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

    (1) for a tax or a customs duty—

       . . . .

    (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

11 U.S.C. § 523(a)(1)(C).

duties included overseeing the initial public offering of the company. At the time of the offering, Joseph received approximately 58,000 shares of Converse stock for approximately $1.50 per share. Its value at that time was approximately sixteen to eighteen dollars a share.

Late in 1984, Joseph left Converse and joined a law firm. Converse continued to pay him until early 1985. When he joined the firm, Joseph paid a partnership contribution of $50,000 and paid $25,000 into a trust which held the firm's real estate. That firm dissolved in 1989 and Joseph formed a partnership with another attorney. Since 1992, he has had a solo law practice concentrating on real estate law.

Joseph was examined at length by counsel for IRS. He tried very hard to convince the hearers that he was very astute and technically proficient as an attorney and that his legal abilities were far superior to those of the attorney examining him. He grasped at ambiguities in questions and at imperfections in exhibits. I became convinced that he knew exactly what he was doing at all times. As to the delay in filing returns, he was most direct:

Q. Now, can you tell me why there was a ten-year, approximately a ten-year delay in filing the 1985 return?

A. I never believed that I owed any taxes for the year 1985. I believe that payments that I had made and the limited amount of income having just shifted over from another firm, and being unemployed most of the year, that we had no tax liability for that year, and consequently I did not file that return until I filed other tax returns.

Q. Did you know that you had a duty to file a tax return?

A. Yes.

Q. So did you intentionally hold off filing your return?

A. Yes.[2]

After receiving her college degree, Donna taught school briefly. She married and raised and saw to the education of six children. She has been a licensed real estate broker since 1981. During the 1980's she worked part-time as a real estate broker. She testified that after 1991 she earned in the range of $100,000 to $200,000 in commissions from sales where the commission was approximately five percent of the sales price. Donna testified that she carefully recorded her expenses from 1985 onward for, among other reasons, her taxes. The tax returns that the Debtors ultimately filed reflect that Donna paid close attention to her expenses. She testified that she knew she had to file a tax return. She explained that she gave her information to her husband and that he was charged with filing the tax returns due to a division in marital duties. When asked whether she questioned the fact that she had not signed a return for ten years she stated that she "didn't even realize at that point that maybe I needed to ..." T1, January 6, 2004, p. 31. Donna's attempts to seem unaware of matters financial conflicted with the evidence that she was and is adept at running a large household and a successful business.

B. The Tax Returns [3]

1. 1985

In 1985, Joseph received income from his partnership, the liquidation of approximately 1,000 shares of Converse stock and from his severance package. Donna received income from her real estate brokerage business. The Debtors did not filed

---

2. Transcript of Trial, January 5, 2004 ("T1"), p. 38.

3. A chart of the returns is set forth in Appendix A

their return for 1985 until 1995 and were assessed a deficiency of $488. Joseph testified that he did not file a return because he did not believe he owed any tax as a result of payments he had made and the limited amount of income after his job at Converse terminated.[4] He knew he had a duty to file and admitted he had intentionally refrained from filing. He testified that for this year and the subsequent ones he participated in filing the returns for the real estate trusts, described below, because outsiders were involved and he did not want to prejudice them.

### 2. 1986

In April of 1987, the Debtors filed a request to extend the deadline to file their return and included a payment for $73,000. The Debtors also made a payment to the state in the amount of $27,000. When they ultimately filed their 1986 return in 1995, they disclosed joint adjusted gross income of $329,965 presenting a tax liability of $151,062. Part of that income as reported on the return was the gain from the sale of two different amounts of Converse stock. Another part of the income was the proceeds from the sale of a summer cottage which Joseph testified he thought at the time was a non-taxable event. Their 1986 return contains a deduction for receipt of Kiplinger Tax Letter which Joseph claims he used for professional practice.

When questioned about this return, Joseph testified that he, similar to 1985, was unfamiliar with self-employment tax and alternative minimum taxes which are line entries on the returns they ultimately filed. He also thought he owed no taxes because of the losses that they had in-

curred with their investments and the interest payments they had made.

He gave somewhat conflicting accounts about how he determined that he would pay $73,000 to the federal government and $27,000 to the state. The more believable explanation is that he obtained a payment of $100,000 from his law practice and divided it according to the percentages the two taxing authorities might receive for this asset without relation to the Debtors' income. The Debtors were assessed a deficiency in the amount of $1,473.

### 3. 1987

In April of 1988, the Debtors filed a request to extend the deadline for filing their tax return along with a payment of $7,500. The Debtors did not file their return for this year until 1995 and ended up owing $2,320.

### 4. 1988

The Debtors again filed for an extension of the deadline to file their tax return and included a payment for $1,200. They filed their return in 1995. They owed approximately $2,100.

### 5. 1989, 1990, 1991, 1992, 1993

The Debtors did not file these returns until February of 1995. They did not pay estimated taxes in 1989, 1990 and 1993. With most of the returns when filed, the Debtors were shown to have a deficiency.

In 1992, they filed for an extension along with an estimated payment of $10,000. When they filed their return in 1995 their tax obligation was almost $44,000. Joseph testified that the estimate was based upon what they could afford to pay.

---

4. In a deposition attached to an opposition to an earlier filed motion for summary judgment, the Debtor explains that in 1986 he filled out a return for 1985. Memorandum of Fact and Law in Opposition to Motion of the United States for Summary Judgment, Exhibit 1, p. 14.

The Debtors approached an accountant in 1993 or 1994 and began to prepare their returns. It was at this time that the United States was contacting the Debtors with respect to their missing tax returns.

## C. The Investments

Between 1984 and 1993, the Debtors made a variety of investments. From 1970 until 1987, the Debtors lived in a home that they purchased for approximately $42,000 and sold for approximately $385,000. In 1986, they began the construction of a house for which they ultimately paid approximately $850,000. They sold this house in 1991 for $655,000. They moved to another house in 1991 which house their bankruptcy trustee sold in 1997. Between 1991 and 1995, the Debtor arranged for repairs and updates for this house.

From 1984 until 1986, the Debtors purchased stock in Apache Petroleum in the total amount of $5,000. In 1984, Joseph joined a law firm and paid $50,000 of the Debtors' personal funds to join the partnership. They further paid $25,000 for a 25% equity interest in the two condominiums that the law firm owned. The firm dissolved in 1989. The members of the firm formed other realty trusts to invest in several types of properties during its existence such as condominiums and land for development. Although Joseph was vague as to the exact amounts, he acknowledged that the Debtors invested funds to obtain interests in these trusts. Many of these properties were sold at a loss.

In 1986, Joseph formed the Sunset Ridge Realty Trust for the purpose of buying land that he and another individual were going to develop and sell. Donna was a trustee of this trust. The Debtors initial deposit was either $10,000 or $20,000. The Debtors and their partner on the project had to contribute more funds periodically as they sought the appropriate permits to develop the property. The Debtors built a house on one of these lots and testified that it cost the Debtors approximately $850,000 to build the house.

In June of 1986, the Debtors helped form and obtained a 1/3 interest in the Pellex Realty Trust which was charged with the development of 65 acres of land in New Hampshire. The purchase price was approximately $420,000. Joseph testified that they invested approximately a total of approximately $240,000 in this trust but did not have any return on the funds.

Joseph testified that he participated in the preparation for the tax returns for the forgoing realty trusts. He explained that the returns were always timely filed because, when it came to his partners, he wanted to make sure that they were filed.

## III. Discussion

### A. The Case Law

■■■ Exceptions to discharge must be strictly construed in favor of the Debtors. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The United States bears the burden of proving that the Debtors willfully attempted to avoid their taxes by a preponderance of the evidence. *In re Gardner*, 360 F.3d 551 (6th Cir.2004). Based upon the forgoing cases, the government must establish that the debtors engaged in conduct designed to evade or defeat their tax liabilities. Additionally, it must demonstrate that the Debtors had a duty to pay taxes, knew of the duty and voluntarily and intentionally violated the duty.

Several courts of appeal have addressed the application of 11 U.S.C. § 523(a)(1)(C). *See e.g. Gardner v. United States (In re Gardner)*, 360 F.3d 551 (6th Cir.2004); *In re Fretz*, 244 F.3d 1323 (11th Cir.2001); *Griffith v. United States (In re Griffith)*,

206 F.3d 1389 (11th Cir.2000), *cert. denied,* 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 37 (2000); *Tudisco v. United States (In re Tudisco),* 183 F.3d 133 (2d Cir.1999); *United States v. Fegeley (In re Fegeley),* 118 F.3d 979 (3d Cir.1997); *In re Birkenstock,* 87 F.3d 947 (7th Cir.1996); *Dalton v. I.R.S.,* 77 F.3d 1297 (10th Cir.1996); *Bruner v. United States (In re Bruner),* 55 F.3d 195 (5th Cir.1995); and *Toti v. U.S. (In re Toti),* 24 F.3d 806 (6th Cir.1994), *cert. denied,* 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994).

In *Toti,* the debtor failed to file his federal income tax returns or pay the corresponding tax for eight years. 24 F.3d at 807. After pleading guilty, he was convicted and sentenced for a portion of these omissions. *Id.* He was unable to complete his agreed upon payments and filed for bankruptcy. 24 F.3d at 808. After considering his adversary complaint to discharge the tax liability, the bankruptcy court concluded that upon application of a criminal standard to the term "willfully", the debtor was entitled to discharge the debt because his failure was an omission, not a commission. 24 F.3d at 808. The district court concluded that the lower court had applied the wrong standard and reversed.

On appeal, the Sixth Circuit explained that the "district court here held that the definition of 'willfully attempted to evade' was consistent with the definition found in other civil tax cases, which equate 'willful' with voluntary, conscious, and intentional evasions of tax liabilities." *Id.* at 809. The court held that "a plain reading of § 523(a)(1)(C) includes both acts of commission and acts of omission." *Id.* In affirming, the Sixth Circuit concluded that the district court was correct in ruling that a failure to file a return and failure to pay a tax fell within the definition of the statute. *Id.*

In *Bruner,* the debtors failed to file federal income tax returns or pay any income tax between 1981 and 1988. 55 F.3d at 196. Dr. Bruner pled guilty to one count of willfully failing to file his return in 1981. *Id.* Thereafter, the debtors accepted determinations for tax liabilities for certain years and filed returns for other years. Although the debtors were able to pay some of their substantial liability, they filed for bankruptcy relief and filed an adversary proceeding seeking to discharge their outstanding federal tax liabilities. The bankruptcy and district courts concluded that the taxes were nondischargeable.

On appeal, the Fifth Circuit rejected the standard set forth in *In re Haas,* 48 F.3d 1153 (11th Cir.1995) and chose to follow the path of *Toti.* It concluded that consistent non-payment and failure to file returns in addition to a concealment of assets warrant denial of the discharge of the tax obligation. 55 F.3d at 200. It explained:

> Section 523(a)(1)(C) surely encompasses both acts of commission as well as culpable omissions. The language of the statute itself reveals that a willful attempt 'in any manner' to evade or defeat a tax precludes discharge. Moreover, we conclude that the Bruners' activities were more akin to those of *Toti* than those of *Haas. Toti* … only filed his returns when the threat of criminal sanctions became a reality, and even then he did not pay his entire tax obligation…. This is not a case of 'mere' non-payment like that in *Haas.* Thus, we need not squarely resolve the 'affirmative act' argument forwarded by the Bruners, because the Bruners did engage in affirmative acts designed to evade their tax liabilities.

*Id.* at 200.

In *Dalton,* the Tenth Circuit explained that the bankruptcy court had determined

that the debtor concealed his interest in a condominium at the time that he was subject to a personal tax investigation in order to avoid an attachment. 77 F.3d at 1302. Further, it found that at the time the debtor knew he had a substantial tax burden he facilitated the start of a business in which he held a variety of positions but took no salary or stock. *Id.* Instead, his inexperienced wife received most of the stock and a full-time salary. *Id.* The bankruptcy court therefore concluded that the debtor willfully concealed his interest in the company to avoid paying taxes. *Id.* at 1304.

The Tenth Circuit first concluded that the phrase, "in any manner" had to broadly defined and would included concealment of assets to protect them from attachment. *Id.* at 1301. The court did agree with *Haas* that failure to pay taxes, on its own, is insufficient to deny the dischargeability of the debt. *Id.* at 1301. "Rather, nonpayment is relevant evidence which a court should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes. *Id.* The term willful will be satisfied if it can be established that the debtor's actions were voluntary, consciously or knowingly, and intentionally. *Id.* at 1302. The court concluded that the bankruptcy court's findings were not clearly erroneous.

In *Birkenstock*, the debtors filed an erroneous return which the Seventh Circuit recognized in an appeal of the statutory notice of deficiency. 87 F.3d at 949. While that matter was being litigated, the debtors transferred a portion and then the entire amount of their assets to a family trust for no consideration. *Id.* After the formation of the trust, the debtors attempted to assign their income to the trust. *Id.* The tax court ruled that the income was taxable to the debtors. Mr.

Birkenstock was also found guilty of willful failure to file his income taxes for four years. *Id.* The United States filed a complaint seeking, *inter alia,* an order that the tax debt not be discharged. *Id.*

In discussing the statute, the Seventh Circuit stated that in order to prevail the government had to establish a conduct and a mental state. *Id.* at 951. In agreeing with other courts, the court stated if the government can establish that a debtor failed to pay taxes in addition to a pattern of failure to file returns or where there are measures to conceal assets or income, the debt will be nondischargeable. *Id.* at 951–52. Based upon the forgoing facts, the court readily found that the government had met the conduct requirement. *Id.*

To establish the mental state, the court ruled that "the debtor must both (1) know that he has a tax duty under the law; and (2) voluntarily and intentionally attempt to violate that duty." *Id.* (citing *Bruner,* 55 F.3d at 197). The court ruled

. . . Mr. Birkenstock's own testimony demonstrates that he is college educated; that he participated directly with the lawyers and accountants in determining whether to form the trust, in actually creating the trust, and in deriving and reporting his taxable income during 1975 through 1979; and that he decided to form the trust despite knowledge that the IRS was investigating the use of such trusts as tax shielding devices. This, in light of Mr. Birkenstock's history of attempts to avoid federal income tax, and together with the nature and operation of the trust (which is discussed above), supports the determination that Mr. Birkenstock's creation of the trust and subsequent attribution of his income to it was specifically intended to avoid known tax liabilities.

87 F.3d at 952.[5]

In *Fegeley*, the debtor failed to file a return or pay taxes for three years. *United States v. Fegeley (In re Fegeley)*, 118 F.3d 979 (3d Cir.1997). After being contacted by the government, the debtor filed his returns. *Id.* at 981. He thereafter pled guilty with respect to one of his returns. *Id.* After filing for bankruptcy relief, the debtor filed an adversary proceeding to determine whether his liability had been discharged. *Id.* The bankruptcy court ruled in favor of the debtor. *Id.*

The district court reversed and the Third Circuit affirmed. The court agreed that the applicable statute applies to acts of omission as well as commission. *Id.* at 983. The court agreed with the district court that the debtor's intentional failure to file his returns and pay the tax was sufficient to show that he attempted to evade his tax obligation. *Id.* The court further concluded that because the debtor had a duty to file his return, knew his duty and voluntarily and intentionally violated that duty, the government had established the debtor's culpable mental state. *Id.* at 984.

While brief on facts, it appears in *Tudisco* that the debtor failed to file his returns for certain years. *Tudisco v. United States (In re Tudisco)*, 183 F.3d 133 (2d Cir.1999). Moreover, the debtor filed a false affidavit with his employer in order that he be exempt from withholding. This conduct, the court concluded, was sufficient to satisfy the conduct element. *Id.* at 137. The court did not find his excuse as to why he had failed to pay credible and affirmed the lower court on this issue. The court relied upon and adopted the rules of law set forth above.

In *Griffith*, the debtor was the owner of several subchapter S corporations. *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1391 (11th Cir.2000) *cert. denied*, 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 37 (2000). The Tax Court ruled that for several years the debtor had underpaid his taxes but it did not impose penalties for fraud. *Id.* Thereafter, the debtor transferred his interest in the corporations to himself and his new wife as tenants by the entirety. Those assets could not be levied on without a judgment against both spouses. *Id.* The debtor then filed for relief and sought to discharge his tax debt which had almost reached $2,000,000. *Id.* The bankruptcy court disagreed with the debtor and ruled that the statute not only covers evasion of the assessment of the tax but also evasion of the payment. *Id.* at 1392.

The Eleventh Circuit explained that in *Haas* it had concluded that an evasion at assessment prevents discharge of the tax debt but evasion at the point of payment does not. *Id.* In the appeal, the debtor relied on the *Haas* decision. The Eleventh Circuit recognized that several courts of appeal had rejected the forgoing ruling from *Haas*. In this appeal, the government urged the court to agree that the statute contemplates finding nondischargeable a tax where the debtor avoided assessment or payment. *Id.* at 1394.

The court reaffirmed its first holding in *Haas* that mere failure to pay a tax does not render the debt nondischargeable. *Id.* The court then turned to "the question of whether [the statute] applies to a willful attempt to evade or defeat collection of taxes where the debtor engaged in affirmative acts other than mere nonpayment of the taxes." *Id.* The court concluded

---

**5.** The court reversed the ruling against Mrs. Birkenstock on the grounds that the government failed to demonstrate that she willfully

evaded payment of the outstanding obligation. *Id.*

While we believe that the application of the canons of construction produced a plausible interpretation of § 523(a)(1)(c) in *Haas*, we now conclude that the more reasonable interpretation of § 523(a)(1)(C) is that it renders nondischargeable tax debts where the debtor engaged in affirmative acts seeking to evade or defeat collection of taxes. This interpretation accords well with the interest that Congress was attempting to balance in enacting the predecessor statute to § 523(a)(1)(C); to permit' an honest but financially unfortunate debtor [to make] a fresh start unburdened by what may be an overwhelming liability for accumulated taxes," while avoiding the creation of 'a tax evasion device.' ... As the Tenth Circuit recognized, an interpretation of § 523(a)(1)(C) that permits a debtor to engage in affirmative behavior in order to evade collection of taxes serves neither of those purposes, but, instead, advantages *dishonest* debtors. *See Dalton,* 77 F.3d at 1301.

206 F.3d at 1395.

After applying the facts of the case, the court found no error by the lower courts. The court agreed that the requisite conduct was established with proof of the debtor's intra-family transfers. *Id.* at 1396. Using the three-prong test found in *Birkenstock,* the court further agreed that the element of willfulness had been established. *Id.*

The Sixth Circuit has recently issued another decision on this issue. *Gardner v. United States (In re Gardner),* 360 F.3d 551 (6th Cir.2004). In that case, the debtor sought to discharge his obligation to the United States for two years worth of unpaid taxes. *Id.* at 554. The bankruptcy court denied the discharge of the debt and the district court agreed. *Id.* at 561.

The Sixth Circuit explained that the debtor, a personal injury attorney, failed to pay his taxes for two years. *Id.* at 551. The debtor met with the government to try and settle the claim. *Id.* at 555. The debtor provided the government with the forms required to assess his assets. *Id.* The debtor did not provide complete disclosure of his assets. *Id.* Thereafter, the debtor received a settlement from a case which he did not apply to his outstanding indebtedness. The IRS then placed a levy on any assets of his which the law firm held. *Id.* The law firm then turned over some of the proceeds of a settlement but not the debtor's entire share. *Id.* at 556. The government established that the Debtor retained interests in nominee bank accounts and that he led a lavish lifestyle after incurring the debt. *Id.*

The court clarified that the applicable statute applied to acts of omission and commission. *Id.* at 557 (citing to *Toti v. U.S. (In re Toti),* 24 F.3d 806, 809 (6th Cir.), *cert. denied,* 513 U.S. 987, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994)). Further, the court stated that in order to meet the standard, the government must establish the conduct and mental state. *Id.* at 557–58. It concluded that the first prong was established when the government demonstrated that the debtor placed assets in nominee accounts. *Id.* at 559.

With respect to the second prong, the debtor argued that the court not apply *In re Toti* because that case addressed defeating an assessment. *Id.* at 558. The Sixth Circuit stated, however, that *Toti* did not distinguish between payment and assessment. *Id.* Secondly, the court recognized that it was bound by *Toti. Id.* Third, it recognized that *In re Griffith* overruled *Haas* and that the Third, Seventh, Tenth, Second and Fifth Circuits have rejected *Haas* as well. *Id.*

In *Gardner,* the court established that the debtor used a variety of accounts to hide his assets. He further omitted to

apply the proceeds of lawsuits to his tax obligation after he had convinced the government to defer collection until the lawsuits were resolved. The debtor also took many trips during the period that he incurred outstanding tax debt and which the lower court found were not business related. *Id.* at 560. These acts constitute both an affirmative act and an omission sufficient to satisfy the conduct prong of § 523(a)(1)(C). *Id.* at 558, 560. With respect to the mental element, the government established that the debtor knew he had to pay his taxes and could have but did not. *Id.* at 560. The court therefore affirmed the bankruptcy court. *Id.*

In addition to *Haas* and *Griffith,* the Eleventh Circuit issued a subsequent decision which facts are parallel to the ones contained in this case. *In re Fretz,* 244 F.3d 1323 (11th Cir.2001). In Fretz, the debtor did not file his returns or pay his taxes for ten years. *Id.* at 1325. Although the debtor maintained his position as a physician during his period of nonpayment, the bankruptcy court ruled his tax debt dischargeable because his alcoholism during that period negated any willfulness. *Id.* at 1326. During the period on non-payment, the debtor also switched from being a salaried employee to an independent contractor. *Id.* at 1325. The Eleventh Circuit ruled that the failure to pay and file was a culpable act of omission which act must be included in the definition of "any manner". *Id.* at 1329–30 (agreeing with *In re Fegeley* and *In re Toti*).

As to whether the government proved the mental state requirement, the court ruled:

> There is no evidence that Dr. Fretz' failure to file returns and pay taxes during these years was due to inadvertence or mistake; indeed his own testimony rules out that possibility. As a practic-

ing emergency room physician, he had the means to pay his taxes, and he had the ability either to file his tax returns himself or to engage an accountant to file the returns for him. Put bluntly, someone who can control his drinking enough to perform medical procedures during twelve—to twenty-four hour shifts in an emergency room over a period of years can control his drinking enough to file tax returns and pay taxes during that same period. Instead of doing that, as Dr. Fretz himself put it, he 'just totally ignored' his tax responsibilities. He chose to ignore them, just as he chose not to ignore his emergency room responsibilities. Under these circumstances, the finding that Dr. Fretz' attempt to evade or defeat his tax liability was not willful is clearly erroneous.

244 F.3d at 1331. *See also, Mathis v. United States of America (In re Mathis),* 310 B.R. 468 (Bankr.S.D.Fla.2004)(concluding tax debt of debtor who failed to file and pay for 7 years nondischargeable under *Fretz.*)

### B. Position of the Parties

In their pre-trial brief, the Debtors contend that their tax obligation is dischargeable because their failure to file and pay taxes was the result of mere procrastination. During their opening statement, the Debtors urged the Court that willfulness for purposes of this statute must be the same as criminal willfulness found in section 7021. In their post-trial brief, the Debtors contend that the Fifth, Tenth and Seventh Circuits all require some type of affirmative acts in order to conclude a debt nondischargeable under the statute. The Debtors further urge the Court to follow *McDonald v. United States (In re McDonald),* 249 B.R. 312 (Bankr.E.D.Mo. 1999), *Rouley v. United States,* 305 B.R. 577 (Bankr.M.D.Fla.2003) and *Friedman*

*v. I.R.S. (In re Friedman),* 200 B.R. 1 (D.Mass.1996).

With respect to the evidence at trial the Debtors contend:

> The United States of America has been able to prove that the Steinkrausses earned income during the years 1985 through 1993. While Mrs. Steinkrauss was not aware that the returns were filed or even when returns were due, Mr. Steinkrauss did, in fact, attempt to estimate their income taxes for the years in question. Because of his incorrect assumption with respect to the tax law, those estimates were insufficient even though he believed that refunds would have been due him in most situations. The Government has also demonstrated that the Steinkrausses lived their lives and made investments in real estate. Those investments were made in the customary fashion. Any investments that required separate reporting were always reported to the Internal Revenue Service and the investments that they held at the time of their bankruptcy were sold through this proceeding. This is woefully short of the standard of proof required in the Fifth, Tenth, and Seventh Circuits ... In point of fact, Mr. Steinkrauss' returns, though delinquent, were audited by the Internal Revenue Service for the years 1985 through 1992 and minor adjustments were made and no penalties asserted.... There is no proof whatsoever that Donna Steinkrauss willfully attempted in any manner to evade the tax under either an omission or a commission standard.

Brief for Debtor, pgs. 15–16.

The United States counters that the Debtors "had the ability to determine their liabilities and to file their returns that were due, as well as the wherewithal to pay their taxes. Nevertheless they failed to file tax returns, failed to pay their taxes, or sought extensions of the time to file returns while understating their liabilities in a manner that contributed to the defeat of the collection of their full and correct unpaid, or underpaid, federal income tax liabilities." United States Post Trial Brief, p. 14. Under the standards set forth in the above-described cases, contends the United States, the Debtors tax obligation must not be discharged. The Debtors, it argues, are highly paid professionals that knew they had an obligation to file returns but did not. The United States contends that their belated attempts to file and pay are irrelevant. Moreover, the Debtors filed false extensions. The United States urges that their attempts to lessen their culpability by testifying that they were unfamiliar with the employment tax and the alternative minimum tax are not credible particularly since these items are listed on the applicable tax form. The United States explains that the Debtors' payment for 1986 was well short of the mark and Mr. Steinkrauss' estimate of $10,000 for 1992 was not based on any liability for that year.

## C. Analysis

While the Debtor and the I.R.S. attempt to steer this Court to one cluster or another of the relevant circuit court opinions, the holdings in those cases are more similar then different. It is the facts that set some apart from others, such as whether the actions were avoiding assessment or payment and whether there was an underlying criminal conviction. The cases all reflect the holding that mere nonpayment is insufficient and for the United States to prevail it must establish a conduct and a mental state. The Debtors freely admit that they did not timely file their returns or make payments for several years. The issue which they contest is

whether the United States has demonstrated that the Debtors willfully failed to file their returns and to pay their taxes.

Their testimony reflected that they are intelligent and successful individuals. Joseph is highly educated and has held positions with responsibility for both the United States Army and two publicly traded corporations. He has successfully earned a living as a solo real estate attorney. He was involved in a number of sophisticated real estate investments with significant amounts of money. He testified that he capably assisted the real estate trusts in which he was involved to timely file their returns but knowingly neglected to fail his personal returns. He frequently filed for extensions of time to file his tax returns but never filed the returns. He admitted to making estimated payments which were based upon an ability to pay and not on what he actually might owe. He also began preparing the tax returns at approximately the time they were owed with forms that contain entries for the taxes about which he later incredibly claims he had total ignorance.

Donna is also college educated. She capably raised six children and began a real estate practice. She became a very successful breadwinner despite her attempts to characterize herself as the innocent spouse. She testified that she knew that the Debtors had a duty to file tax returns. She participated in their investments in the various real estate trusts.

The Debtors' argument that they did not file their returns because they thought they owed no money carries little weight. That an individual believes he or she may not owe taxes is not the determinative factor in whether that taxpayer must file a return. Rather, the determination is based solely upon the amount of the gross income. 26 U.S.C. § 6012(a). Moreover, the Debtors' pattern of non-filing and non-payment for eight years included years during which they earned a significant income and owed significant taxes. That they also paid estimated taxes indicated that at least for some of those years they recognized they owed taxes.

Part of why the Debtors claimed that they thought they owed little or no taxes was because they alleged that they misunderstood the alternative minimum tax and self-employment tax. The Debtors are two successful business people who, in addition to their professions, engaged in a series of sophisticated real estate investments. They knew they had an obligation to pay taxes and went so far as to keep careful records with respect to their expenses over the several years for which they did not file returns. Joseph drafted a return that contained entries for the taxes of which he now complains. That they both were self-employed does not excuse them from their responsibilities to ascertain their tax obligations for eight years. Their claim of ignorance, therefore, simply rings hollow.

The Debtors further claim that their occasional attempts to pay estimated taxes demonstrates that they their tax failures were not willful. Such payments, they contend, alerted the United States that they were earning an income. The Debtors, however, did not file correct estimated taxes as they did not make the calculations based upon what they thought they owed. They did not file estimated taxes every year. Further, the payment of an estimated tax does not excuse the filing of a tax return by the extended deadline. The payments themselves appear less of an attempt to notify the United States than an attempt to placate.

The United States established that the Debtors were well-educated, intelligent and successful business people who did not file their tax returns or pay their taxes for

eight years. They occasionally paid their estimated taxes but did not make the estimation based upon their actual revenue. They never bothered to ascertain their tax responsibilities if they were, in fact, confused about their obligations. During this period of time, they were comfortably devoting their excess assets to multiple sophisticated real estate investments. During this time they were able to oversee the building of an expensive home which project involved land development, extensive drilling, local permitting and the house construction. All the while they kept records of expenses for tax purposes. The Debtors knew they had a duty to file tax returns and pay taxes but voluntarily violated that duty for eight years.[6] It appears that the Debtors began to consider the responsibility at the time that the United States started making inquiries of them regarding the status of their returns.

The Debtors are correct that their actions do not involve the concealment of assets in order to avoid payment of a tax. *See In re Griffith*, 206 F.3d 1389 (11th Cir.2000); *Dalton v. IRS*, 77 F.3d 1297 (10th Cir.1996); and *In re Birkenstock*, 87 F.3d 947 (7th Cir.1996). Nevertheless, the cases that have considered debtors who have failed to file returns and failed to pay taxes have concluded that the debts are nondischargeable particularly when there are additional circumstances. *Tudisco v. United States (In re Tudisco)*, 183 F.3d 133, 137 (2d Cir.1999) (describing failure to pay and file along with false affidavit to employer); *United States v. Fegeley (In re Fegeley)*, 118 F.3d 979, 984 (3d Cir.1997) (conduct met with pay and file failure, mental state met spent money on lavish lifestyle instead of taxes); *Bruner v. United States (In re Bruner)*, 55 F.3d 195, 200 (5th Cir.1995) ("A pattern of non-payment such as is present here, particularly when accompanied by a pattern of failure to file returns and coupled with conduct obviously aimed at concealing income and assets, certainly constitutes a willful attempt to evade or defeat taxes for purposes of § 523(a)(1)(C)."). While failure to pay coupled with failure to file has been found to be sufficient to deny the discharge of a tax debt, *In re Fretz*, 244 F.3d 1323 (11th Cir.2001),[7] such additional circumstances are present here where, during their eight year hiatus, the Debtors had the sophistication and expertise to file and pay the returns but instead used their assets to fund their active real estate investments. Similar to the Eleventh Circuit's statement in *Fretz*, the Debtors chose to ignore their tax responsibilities just as they chose to not ignore their employment responsibilities and their real estate investments.

Lastly, I am unpersuaded by the Debtors attempted to argue that Donna's obligation to the United States should be discharged as she was an innocent spouse.[8]

---

6. The majority of cases use a three prong test to determine whether a failure to pay a tax was willful: (1) whether the debtor had a duty; (2) whether the debtor knew of the duty; and (3) whether the debtor voluntarily and intentionally violated the duty." *See e.g. Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir.2000).

7. To counter the effects of *Fretz*, the Debtors cite to *Rouley v. United States of America (In re Rouley)*, 305 B.R. 577 (Bankr.M.D.Fla. 2003). In that case, the debtor did not file her returns for eight years or pay her taxes.

*Id.* at 578. Ultimately she filed her returns, filed for bankruptcy in California, her case was dismissed and she filed again in Florida. *Id.* at 579. Judge Paskay ruled that because at the time of the second filing the filings were current but not the payments, the government had not established the conduct element of the statute. *Id.* at 580–81. The conduct element of the statute is not at issue in this case.

8. The cases to which the Debtors cite were attempts to impute to one spouse the fraud of the other and are irrelevant to this matter.

Her attempts to verify this characterization during her testimony lacked credibility.[9] The government established that she was a successful business woman. She acknowledged that she knew she had an obligation to file and pay taxes but did not. Her attempts to explain away her lack of filing returns or pay her taxes as a division of duty in her marriage are unavailing.

## IV. *Conclusion*

The United States has demonstrated by a preponderance of evidence that the Debtors willfully failed to evade or defeat their tax liabilities. As such, I will enter a separate order granting judgment for the United States.

### Exhibit A

| Tax Year | Return Due | Return Filed | AGI | Tax Reported Due [10] | Deficiency Assessed |
|---|---|---|---|---|---|
| 1985 | 04/15/86 | 04/08/95 | 70,079 | 1,880 | 488 |
| 1986 | 08/15/87 [11] | 02/23/95 | 329,965 | 73,000/151,062 [12] | 1,473 |
| 1987 | 04/15/88 | 02/23/95 | 64,579 | 9,820 | |
| 1988 | 04/15/89 | 02/23/95 | 72,573 | 2,156 | 199 |
| 1989 | 04/15/90 | 02/23/95 | 83,022 | 11,669 | 184 |
| 1990 | 04/15/91 | 02/23/95 | 54,283 | 12,965 | 120 |
| 1991 | 04/15/92 | 02/23/95 | 158,738 | 18,296 | 5,045 |
| 1992 | 04/15/93 | 02/23/95 | 154,804 | 43,863 | 422 |
| 1993 | 04/15/94 | 04/18/95 | 173,167 | 48,477 | |

*See e.g. United States v. Binkley (In re Binkley),* 242 B.R. 728 (M.D.Fla.1999).

Q. Okay, Sunset Ridge Trust, Realty Trust, okay. Were you a beneficiary of Sunset Ridge Realty Trust?
A. Was I beneficiary of it?
Q. Yes.
A. What do you mean by that?
Q. Were you a beneficiary or were you a trustee of that trust?
A. You asked me if I was a beneficiary. Do you mean was I the only beneficiary?
Q. Were you a beneficiary?
A. All right, because you didn't explain it that way before, you just asked if I was. So I would have been a beneficiary, I would presume.

Q. You presume. Were you—you presume. Do you not recall?
A. Do I recall?
Q. No you just said "I presume." I mean are you not certain?
A. Was I not certain?
Q. Are you not certain?
A. Am I not certain? From what I've been, understand, yes. I was part of that—or I was, if I wasn't one of the—if it was just my husband and Mr. Galehouse, then we would be trustee, I wouldn't be a trustee.
T1, p. 35–36.

10. Net of any withheld or other payments made during taxable year.

11. Form 4868 filed for automatic extension

12. Per extension request/return.