John P LANDI and Phyllis Landi, Appellants,

v.

UNITED STATES of America, Appellee.

No. 2:02–CV–593–FTM–29DNF.

United States District Court, M.D. Florida, Fort Myers Division.

Sept. 9, 2004.

Ronald L. Stetler, Garlick, Stetler & Peeples, LLP, Naples, FL, for Appellants.

Philip Doyle, Washington, DC, for Appellee.

## OPINION AND ORDER

STEELE, District Judge.

This matter comes before the Court on an appeal of the Findings of Fact, Conclusions of Law and Memorandum Opinion (Doc. # 73)[1] and the resulting Judgment (Doc. # 74) determining that appellants' federal income tax liabilities for certain years were excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C). Appellants John P. Landi and Phyllis Landi (collectively the Landis or appellants) filed a Brief (Dist.Doc. # 21), and the appellee the United States of America (the United States or appellee) filed a Brief (Dist.Doc. # 27).

## I.

The United States District Court functions as an appellate court in reviewing decisions of the United States Bankruptcy Court. *In re Miller*, 39 F.3d 301, 305 (11th Cir.1994). The legal conclusions of the bankruptcy court are reviewed *de novo, In re JLJ, Inc.*, 988 F.2d 1112, 1116 (11th Cir.1993), while findings of fact are reviewed for clear error. Fed. R. Bankr.P. 8013; *In re Thomas*, 883 F.2d 991, 994 (11th Cir.1989), *cert. denied*, 497 U.S. 1007, 110 S.Ct. 3245, 111 L.Ed.2d 756 (1990). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Crawford v. Western Elec. Co., Inc.*, 745 F.2d 1373, 1378 (11th Cir.1984)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). *See also In re Cox*, 338 F.3d 1238, 1241 (11th Cir. 2003).

## II.

The Landis filed a voluntary petition under Chapter 7 of the Bankruptcy Code on January 11, 2001. The Internal Revenue Service (IRS) filed a $1,126,693.47 claim on behalf of the United States for income taxes, interest and penalties for the years 1990, 1991, 1993, 1994, 1995, and 1996. The Landis then filed a Complaint in an adversary proceeding seeking, among other things, a determination that the federal income tax liabilities were dischargeable. The United States contended that the Landis purposefully evaded tax liabilities for certain tax years, and therefore discharge of that tax debt should not be granted. A trial was conducted before the bankruptcy judge over the course of three days. On September 24, 2002, the Honorable Alexander L. Paskay entered Findings of Fact, Conclusions of Law and Memorandum Opinion (Doc. # 73) determining that the Landis' federal income tax liabilities for the years at issue were excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C). Judgment (Doc. # 74) was entered accordingly, and this appeal followed.

## III.

Pursuant to 11 U.S.C. § 727, a debtor under Chapter 7 of the Bankruptcy Code is generally granted a discharge from all debts that arise prior to the filing of the bankruptcy petition. An exception to the general rule is that a discharge under § 727 "does not discharge an individual debtor from any debt (1) for a tax ... with respect to which the debtor ... willfully attempted in any manner to evade or defeat such tax; ..." 11 U.S.C. § 523(a)(1)(C). Three cases frame the

---

1. The Docket Numbers hereafter refer to the numbers assigned in Bankruptcy Court unless otherwise stated. Copies of the relevant documents are included in the record transmitted by the Bankruptcy Court or attached by the parties.

Eleventh Circuit's interpretation of this statutory exception: *In re Fretz,* 244 F.3d 1323 (11th Cir.2001); *In re Griffith,* 206 F.3d 1389 (11th Cir.) (en banc), *cert. denied,* 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 37 (2000); and *In re Haas,* 48 F.3d 1153 (11th Cir.1995), *abrogated in part by In re Griffith.*

 Exceptions to the general rule of discharge are to be strictly construed in favor of the debtor. *In re Fretz,* 244 F.3d at 1327. The government has the burden of proving by a preponderance of the evidence that the claim is nondischargeable under § 523(a). *Id.* As relevant to this case, the statute contains a "conduct" element and a "mental state" element. *Id.* The conduct required is that the debtor attempted in any manner to evade or defeat a tax, which can include either affirmative conduct or acts of culpable omission. *Id.* at 1327–30. The mental state required is willfulness; this means the attempt to avoid tax liability was done voluntarily, consciously or knowingly, and intentionally. While fraudulent intent is not required, inadvertent mistakes are not sufficient. *Id.* at 1330–31. Thus, to establish the exception, the government must prove that the debtor (1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty. *Id.* at 1330.

It is not contended that the Bankruptcy Court applied incorrect legal principles, and it is clear that the correct law was articulated and applied. (Doc. # 73, pp. 15–18). The Bankruptcy Court found that "the Government has sustained its burden of proving that the Debtors purposefully evaded the payment of taxes." (Doc. # 73, p. 15). There is also no dispute that the facts presented were sufficient to establish that the Landis had a duty to file income tax returns and pay taxes and that the Landis knew of that duty. Appellants contend, however, that the Bankruptcy Court's determination that they voluntarily and intentionally violated that known duty was clearly erroneous, and therefore the tax debt should have been discharged in bankruptcy.

## IV.

### A.

 John P. Landi began a medical practice as a vascular surgeon in 1980 upon completion of a fellowship following medical school. Dr. Landi operated his medical practice through a professional corporation, and opened and operated an office in New York until 1996, when he relocated to Naples, Florida. Phyllis Landi, Dr. Landi's wife, served as his office manager from the inception, essentially handling the financial end of the practice while Dr. Landi performed the surgeries. Until 1990, Mrs. Landi was paid a salary from the professional corporation; since 1990 she received no income from the professional corporation, although she continued to work there five days a week.

As appellants accurately state, "the early 80s were good times for the Landis." (Dist.Doc. # 21, p. 1). The Landis began purchasing real estate, which was held in Mrs. Landi's name because of the fear of medical malpractice judgments against Dr. Landi. Mrs. Landi purchased the first home in New York in 1980 for $450,000. In 1983 the Landis purchased the commercial building in New York City for Dr. Landi's medical practice. In 1985 the Landis purchased homes for both Mrs. Landi's parents and Dr. Landi's parents. The Landis spent freely, and had what can fairly be characterized as an expensive lifestyle.

As it turned out, the Landis weren't the only ones living large during this time

frame. From 1981 through 1987, the Landis' accountant Dennis King was embezzling funds from Dr. Landi's professional corporation. The Landis estimated that the accountant embezzled $1.5 million over this time period; additionally, they spent several hundred thousand dollars on professional fees to straighten out the mess left by King.

Despite the embezzlement, the Landis continued and expanded their expensive lifestyle. Approximately $1 million was spent in improvements to the first Landi house, which was sold in June, 1989 for a net profit of over $1.5 million. Using this sum, plus a $2.6 million loan, Mrs. Landi purchased 58 unimproved acres on Titicus Road to build their dream home. During the construction, the Landis purchased and stayed at a home on Fox Den Lane; the plan was to retain this house for rental income after Titicus Road house was finished. In August 1989, a financial statement showed the medical practice was worth $1 million, the Landis owned several automobiles, and had more than $250,000 in personal property. By 1990 Mrs. Landi owned five pieces of real estate: the building where Dr. Landi's medical practice was located in New York City; the residence where Dr. Landi's parents resided; the residence where Mrs. Landi's parents resided; the Titicus Road residence; and the Fox Den Lane house. Upon completion in 1991, the Titicus Road home was admittedly palatial (Dist.Doc. # 21, p. 4), with approximately 10,000 square feet, six bedrooms and ten bathrooms.

Appellants' real estate holdings then began to unravel. In 1991, the Landis sold the commercial office building. In 1994, the Landis sold Mrs. Landi's parents' condominium, using the profit to pay delinquent state and federal taxes. Also in 1994, the Landis stopped paying on Dr. Landi's parents' condominium, and it was ultimately foreclosed. In 1995, the Fox Den property was foreclosed. In 1996, the Tititus Road property was foreclosed. Mrs. Landi testified that all that was left when they left New York in 1996 for Florida was the $15,000 proceeds from a garage sale.

## B.

The overview of the tax history for the relevant period of 1990 through 1996 was set forth by the Bankruptcy Court. (Doc. # 73, pp. 6–7). Form 1040 tax returns were filed for each of the seven years and showed the following: Dr. Landi's total adjusted gross income was $3,831,474; his wages subject to withholding (i.e., claimed income on Form W–2 Wage and Tax Statements) were $1,789,351; his non-wage income (income from services to a hospital or from the professional corporation not treated as wages) was $1,834,064; his income tax was $887,245; his claimed withholding credit was $172,478; and his balance due the IRS was $796,501. As of the date of the bankruptcy petition, the IRS had collected $12,775.41 of the overdue taxes by levy and $199,616.33 from Landi through voluntary payments; the taxes for 1992 were completely paid. Including penalties and interest, the amount of taxes due as of the filing of the petition was $1,126,693.47. The IRS made collection efforts beginning in 1992.

The government asserted that the Landis had willfully evaded their tax liabilities. The Landis responded that they were simply unable to pay the tax debt, largely because of their purchase of the Titicus Road dream house, but also because of the misappropriation of funds by their accountant from 1981 through 1987 and their failure to curb their lavish personal spending. On appeal, the Landis maintain that the evidence is insufficient to support the Bankruptcy Court's factual finding of will-

ful evasion, and that while the evidence establishes that they failed to pay the taxes, this is insufficient under *Haas*.

## V.

The Bankruptcy Court found that "the Government has sustained its burden of proving that the Debtors purposefully evaded the payment of taxes." (Doc. # 73, p. 15). Appellants challenge this ultimate factual finding, as well as the subsidiary factual findings relied upon by the Bankruptcy Court to support the determination.

The Bankruptcy Court made the following factual findings. The Landis' lifestyle was extravagant (Doc. # 73, p. 10), and they made no meaningful attempt to meet their tax obligations in the years in question. By 1990, the Landis knew they were already "heavily indebted to the Government, due to the claimed embezzlement of their accountant of substantial sums," yet embarked on extremely ambitious undertakings involving very substantial financial commitments knowing that the undertakings in conjunction with the several pieces of real estate would create a new additional financial burden upon them. (Doc. # 73, pp. 18–19). Dr. Landi's very substantial income was used to purchase the Titicus Road opulent dream house; none of the $1.5 million realized from the sale of the Bedford house was used to pay any portion of the tax debt, but was used to purchase and pay for the Titicus Road house, which required $23,000 monthly mortgage payments and $80,000 in annual real estate taxes. (Doc. # 73, p. 19). "This was the first gigantic step towards the entire pervasive pattern of a blatant disregard of their obligation to pay the taxes and use the very substantial earnings of the Debtor to feed their uncontrollable appetite for a lavish life-style." (Doc. # 73, p. 19). Additionally, the Landis used the professional corporation as "their private bank,

disregarding the legal existence of the P.C. from themselves, and indiscriminately using funds from the P.C. whenever needed" (Doc. # 73, p. 10). The evidence revealed "a startlingly graphic paradigm of the most cavalier attitude of a fiduciary dealing with the obligation of a corporate employer to withhold and pay over to the Government the trust fund taxes." (Doc. # 73, p. 11). From 1994 forward the Landis: no longer properly allocated the money earned by Dr. Landi as wages, but treated it as non-wage income, thus relieving the professional corporation of withholding and paying payroll tax; improperly claimed a credit for withholding taxes when little or no withholding was made by the professional corporation or paid to the government; disregarded the separation of the professional corporation from their personal affairs; and improperly ran all funds through the corporate account without filing quarterly tax returns and paying estimated taxes. (Doc. # 73, p. 20). The Bankruptcy Court concluded that it was "satisfied that it is proper to infer that the Debtors embarked on an elaborate willful scheme to not live up to the obligations of paying their taxes." (Doc. # 73, p. 20).

Appellants argue that the Bankruptcy Court erroneously stated that the $1.5 million profit from the sale of the New Bedford property should have been used for taxes, when in fact the Landis did not have a substantial tax problem when they purchased Titicus Road. Rather, appellants argue, their inability to pay taxes developed simultaneously with and as a result of the purchase and construction of the Titicus home. Appellants also assert that the Bankruptcy Court erroneously failed to acknowledge that the consequences of their poor business decision was total financial ruin (Doc. # 21, pp. 13–14), and that what the Bankruptcy Court viewed as a lavish lifestyle in 1990 quickly turned into a desperate attempt to survive by putting all

available funds into the Titicus Road property in a hope of a sale to regain their $1.5 million equity. (Doc. # 21, p. 15). Additionally, appellants assert that the Bankruptcy Court's reference to "uncontrollable spending" in and after 1994 is inaccurate because Mrs. Landi testified they actually curtailed spending beginning in 1994. (Doc. # 21, p. 15). Having reviewed the record in detail, the Court concludes that the Bankruptcy Court's factual findings are supported by the evidence and are not clearly erroneous.

Appellants argue that it was clearly erroneous for the Bankruptcy Court to refuse to admit evidence of the accountant's embezzlement as one of the causes of their financial problems, but then utilize such evidence as it did. (Doc. # 21, p. 13). Despite initially excluding the embezzlement evidence, the Bankruptcy Court ultimately admitted deposition testimony which included such evidence. There was no error, much less clear error, when the Bankruptcy Court considered the embezzlement evidence as information known to the appellants when they began expansion of their financial holdings and as background for their financial choices. Contrary to appellants' argument (Doc. # 21, p. 13), the Bankruptcy Court did not equate poor financial choices and appropriation of funds to non-tax items to intentional conduct. Such evidence was part of the Bankruptcy Court's evaluation of the entire circumstances, and was properly considered in conjunction with other evidence.

Appellants argue that the intermingling of personal and professional corporation finances is irrelevant because nothing was hidden, the money was ultimately treated as income and reported on the annual tax forms, and the non-payment of payroll taxes is not an issue. (Doc. # 21, p. 17). Appellants assert that the accountants testified that the returns properly reflected a credit for the professional corporations part of withholding, and that the Bankruptcy Court's theory of a scheme involving withholding would make no sense. (Doc. # 21, p. 18). Appellants argue that the Bankruptcy Court erred in stating that Dr. Landi treated all moneys earned as wages as "non-wage income" because each year the books were given to accountants who appropriated the income between wages and non-wage income and reflected this on the tax returns filed. (Doc. # 21, pp. 15–16).

It is undisputed that in the early 1990s Mrs. Landi decided to maintain one bank account, which was used for both the professional corporation and payment of Landi personal expenses. The Landis provided the records to accountants, who repeatedly advised them against the practice, since it created a problem calculating the amount which had to be treated as income and determining the proper withholding amount. The Landis, however, continued the practice. Using records supplied by the Landis, the accountants prepared annual tax returns which treated the payment of personal expenses as personal income to the Landis.

As the Bankruptcy Court found, this procedure was consistently improper. If Dr. Landi considered himself an independent contractor and not an employee of the profession corporation, he was required to file quarterly estimated tax returns and pay the amount. Neither Dr. nor Mrs. Landi filed quarterly estimated tax returns and paid the estimated taxes. If Dr. Landi considered himself an employee of the professional corporation, it was required to withhold and pay payroll taxes on quarterly returns. The professional corporation failed to do so, and the trust fund taxes were not paid to the government. The evidence is clearly relevant to the debtors'

intent, and the Bankruptcy Court did not err in these regards.

No only was the procedure employed by the Landis knowingly incorrect, they escalated the amounts they withdrew from the professional corporation without initially declaring the funds as income. The tax returns showed that an increasing apportionment of funds received from the professional corporation consisted of *post hoc* non-wage income rather than salary. Beginning in 1994, Dr. Landi received less in salary and more in "non-wage" income from the professional corporation. This continued practice resulted in funds being used as personal income without a reduction by the withholding of taxes. Essentially, the Landis were using what should have been tax withholdings for personal spending. They increased their cumulative tax debt while siphoning off cash which should have gone to the government. Landi continued the practice, despite warnings from accountants concerning the treatment of trust fund taxes by an employer. There were few quarterly returns filed by the professional corporation, and it paid very little in payroll taxes. The Bankruptcy Court's findings were supported by the evidence and were not clearly erroneous.

Appellants argue that all quarterly tax returns were filed, contrary to the implication of the Bankruptcy Court, although they acknowledge that on many occasions no quarterly taxes were paid. (Doc. # 21, p. 16). On the tax returns, Landi claimed a credit for taxes withheld. While a withholding credit was claimed, the professional corporation paid very little of its withheld tax due to the IRS with its Form 941 for the periods 1990 through 1996. *See* Doc. # 73, pp. 8–9 for summary. The uncollected funds cannot be reported as a credit by the individual, and Dr. Landi was responsible for the trust funds as the responsible person for the professional corporation. Therefore, there was not an entitlement to receive a credit on their individual tax returns.

Appellants argue that they did nothing more or less than thousands of debtors, not paying their taxes and then requesting a discharge in bankruptcy. Appellants assert that they were not treated fairly by the Bankruptcy Court because of the amount of their income and the magnitude of their financial mistakes. Appellants speculate that if their income, debt, and tax liabilities were divided by ten and presented with the same facts on that scale, there is no question their tax discharge would have been granted. (Doc. # 21, p. 9). This argument is frivolous.

The Bankruptcy Court concluded that it was "satisfied that it is proper to infer that the Debtors embarked on an elaborate willful scheme to not live up to the obligations of paying their taxes." (Doc. # 73, p. 20). This finding is not clearly erroneous and is supported by substantial evidence, including (1) the Landis use of the professional corporation to shield cash from the IRS levy so that it would pay all of the Landis' personal expenses; (2) the Landis fraudulent claim of withholding credits against their income, knowing the professional corporation was not paying the corresponding Form 941 taxes; and (3) the Landis failure to pay estimated taxes or to pay any income taxes with their tax returns, all the while maintaining a lavish lifestyle.

Accordingly, it is now

**ORDERED:**

1. The Findings of Fact, Conclusions of Law and Memorandum Opinion (Doc. # 73) and the Judgment (Doc. # 74) are **affirmed.** The Clerk shall enter judgment accordingly and close the file.

2. The Clerk is **directed** to transmit a Certified Copy of this Order to the Clerk of the United States Bankruptcy Court.