In re Jerome H. LACHEEN and Ann Lacheen, Debtors.

Jerome Lacheen and Ann Lacheen, Plaintiffs,

v.

Internal Revenue Service, United States of America, Department of the Treasury, Commonwealth of Pennsylvania Department of Revenue, Defendants.

Bankruptcy No. 04–12711 DWS. Adversary No. 04–0550.

United States Bankruptcy Court, E.D. Pennsylvania.

March 20, 2007.

---

476

Joseph A. Diorio, Fort Washington, PA, Paul S. Peters, III, Martucci & Peters, LLC, Philadelphia, PA, for Debtors/Plaintiffs.

Dashiell C. Shapiro, U.S. Department of Justice, Washington, DC, Russell K. Stewart, U.S.A. Internal Revenue Service, Philadelphia, PA, for Defendants.

### MEMORANDUM OPINION

DIANE WEISS SIGMUND, Chief Judge.

Before the Court is the Complaint of the Debtors Jerome and Ann Lacheen (collectively, "Debtors", "Plaintiffs", or "the Lacheens") to determine the dischargeability of federal income taxes pursuant to 11 U.S.C. § 523(a)(1).[1] The Internal Revenue Service ("IRS") contends that unpaid taxes for the years 1995 and 1996 are not dischargeable pursuant to § 523(a)(1)(C) because Debtors "willfully attempted to evade" their payment.

### BACKGROUND[2]

■ This adversary proceeding was filed on May 25, 2004 by Joseph Diorio, Esquire ("Diorio") on behalf of the Debt-

ors. The Debtors and Diorio were nonresponsive to the IRS's discovery, failing to answer admissions and interrogatories and provide documents requested both formally and informally. Nonetheless, the IRS took Mr. Lacheen's deposition in June 2005. Based thereon, it filed a summary judgment motion ("IRS SJ Motion"). Doc. No. 26. In an Opinion and Order dated December 7, 2005, I denied that relief because the record was not developed fully enough to determine whether Mrs. Lacheen as well as Mr. Lacheen were responsible for what I concluded was exorbitant spending on nonessential purchases during 1995 and whether that spending continued during the 1996 tax year.[3] *Lacheen v. Internal Revenue Service (In re Lacheen)*, 2005 WL 3605280 (Bankr.E.D.Pa. Dec.7, 2005) ("*Lacheen II*").

Concurrently with my consideration of the IRS SJ Motion, the IRS was experiencing continued resistance to its valid document discovery. I entered the first order compelling production on July 15, 2005. Doc. No. 27. The problem was attributed to Diorio who was terminated mid-proceeding, and the Court gave the

---

1. The Complaint sought a determination that taxes for the calendar years 1994, 1995, 1996, 1998, 1999 and 2000 were dischargeable as having been filed more than two years before the filing of the bankruptcy case and assessed. The Answer clarified that the Debtors had no unpaid tax liabilities for 1994 and 1998 so those years were not at issue. Debtors quickly filed a motion for summary judgment on the above grounds which was easily denied for the reasons stated in my Memorandum Opinion dated April 28, 2005. *Lacheen v. Internal Revenue Service (In re Lacheen)*, 2005 WL 1155257 (Bank. E.D. Pa. April 28, 2005) ("*Lacheen I*"). However, it did serve the purpose of defining what taxes were at issue in this matter, *i.e.*, solely 1995 and 1996, and what the issue was, § 523(a)(1)(C).

2. I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorpo-

rated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi*, 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino*, 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991). While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, *In re Aughenbaugh*, 125 F.2d 887 (3d Cir.1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." *In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir.1995) (citing Fed.R.Evid. 201(f) advisory committee note 1972 proposed rules).

3. Accordingly, in their post-trial brief, these are the only issues addressed by the Plaintiffs.

Debtors some leeway on that basis.[4] However, despite assurances that documents would be made available, new counsel was no more successful in facilitating discovery than prior counsel. After Mr. Lacheen testified at a pretrial hearing that he was in possession of responsive documents, Debtors were again directed to produce them, and a conference call was set for June 7, 2006 to ascertain their compliance. At that time I was advised that no documents were produced, the Debtors now claiming that none existed. On June 8, 2006 an amended pretrial order was entered which extended the discovery period for the IRS to take the Lacheens' depositions and in recognition of the IRS's discovery problems, set a date for filing a motion *in limine* should it contend that the lack of discovery impeded its ability to prove its case. Docket No. 59.

On July 7, 2006 the IRS filed a motion to dismiss, stating that Debtors had failed to produce any documents notwithstanding the Court's production orders and Mr. Lacheen's sworn testimony that he possessed responsive documents. Doc. No. 60. While titled as a motion to dismiss, it sought judgment in the IRS' favor finding the tax debt non-dischargeable. On September 18, 2006 after colloquy with counsel, I entered an Order denying the motion, concluding that the remedy sought was not the narrowest form of relief that I could fashion to address the discovery problem. Doc. No. 67. The IRS had been seeking documents to discover why the Debtors had significant disposable income in 1995 and 1996 but failed to pay taxes. To meet its burden that the Debtors intentionally avoided payment of their tax liabilities, they sought to find out just what Debtors did with their income. Rather than find the tax debt non-dischargeable and deprive the Debtors of their day in court, I provided as follows:

> **And** it is also further **ORDERED** that given the Plaintiffs' failure to retain documents that are necessary to the IRS's case, the burden of proof shall shift to the Plaintiffs to prove by a preponderance of the evidence that they did not willfully attempt in any manner to evade or defeat their obligations for taxes for the years 1995 and 1996 so as to require an exception of these tax obligations from discharge under 11 U.S.C. § 523(a)(1)(C);

*Id.* Trial was then scheduled, and both Debtors have now testified. Having heard their explanations which form the basis of my findings of fact below, I am as unable as the IRS to understand why they did not pay their taxes given their disposable income in the tax years in question.[5] It was their burden to prove that their failure to pay their taxes was not a willful attempt to evade their obligations. According, Mr. Lacheen will not be discharged of his liability for income taxes for the years 1995 and 1996. With respect to Mrs. Lacheen, there is an insufficient basis to conclude that her conduct in not paying the 1995 taxes was willful but the evidence does not support a like exoneration for 1996.

---

4. Indeed the trial was adjourned to allow new counsel to become familiar with the file and prepare for trial. Most significantly, Debtors were allowed to file *nunc pro tunc* answers to admissions that Diorio failed to address.

5. In this case, I refused summary judgment to each party because there were disputed issues of fact that would establish whether the *Fegeley* standard was met. However, I early on put Debtors on notice of the relevant inquiry. I stated:

> I still cannot discern why the Debtors with income as reflected in the record made no tax payments. The answer has a direct bearing on whether the Debtors' conduct and mental state warrant that the tax indebtedness not be discharged.

*Lacheen I,* 2005 WL 1155257 at *4.

## FINDINGS OF FACT

1. Mr. and Mrs. Lacheen were married in 1984. Trial Transcript ("Tr.") 6:23–24. She was 24 and he was 48. *Id.* at 43:2–6.

2. Prior to her marriage, Mrs. Lacheen and her young son lived with her mother who managed her money. *Id.* at 43:11–14, 54:21–25.

3. Mr. Lacheen has been a personal injury lawyer since 1971. Business was very good until the legislative enactment of limited tort liability in 1989. The drop off continued until 1995 when he made a lot of money. Tr. 5:5—6:22, 11:1–8. His 1996 income was considerably less than his 1995 income although whether it was more or less than his pre–1995 income was not established.

4. Mrs. Lacheen had no involvement in the operation or finances of Mr. Lacheen's law practice. From 1984 to 1990 she did not work. *Id.* at 44:12, 45:14–16. For two years in the early 90's she worked at a travel agency[6] and summers from 1995–1997 she worked as a camp counselor to pay for her son's tuition. *Id.* at 44:7—45:13.

5. Mrs. Lacheen attended college and an unstated amount of the Lacheens' income went to pay for her college tuition in 1995 and 1996. She is a special education teacher employed by the Philadelphia School District presently. *Id.* at 51:23.

6. The Plaintiffs' 1995 1040 U.S. Individual Income Tax Return, which was filed on October 15, 1996, reflects federal income taxes due of $82,729 based on adjusted gross income of $274,694.00. Joint Pre–Trial Statement ("JPT"), Uncontested Facts ¶ 2, Exhibits G–100.

7. The Plaintiffs' 1996 U.S. Individual Income Tax Return, which was filed on July 15, 1997, reflects income tax due of $36,608 based on adjusted gross income of $152,697. JPT, Uncontested Facts ¶ 3, Exhibit G–101.

8. During the 1995 tax year, the Plaintiffs spent $50,000 for a pool, and $7,000 for window coverings, purchased a new patio/deck that may have cost more than $10,000, and spent unspecified amounts on landscaping, a new fence, and a new driveway. *Id.* ¶ 4.

9. Mr. and Mrs. Lacheen took a vacation to Vienna in 1995. Tr. 31:4—31:12, 31:19–22.

10. Until 1993 the Lacheens lived on Catherine Street in Philadelphia. Mrs. Lacheen found it difficult to raise three young children safely there. Moreover the tuition payments for the two older boys were always late. Tr. 47:22—48:12.

11. Mrs. Lacheen influenced the family to move to the suburbs in 1993 stating that it would be better to send the children to a good suburban free public school rather than expensive private schools in the City. Tr. 23:8–13, 23:23–25. (Mr. Lacheen's testimony) Tr. 47:17–48:10 (Mrs. Lacheen's testimony). They lived in an apartment in Ab-

---

6. The IRS relies on the description of her occupation in the 1995 tax return as "travel agent" to support its request for a finding that she had income during 1995 and 1996 as a travel agent. The 1995 return reflects no wages received and the 1996 tax return reflects no occupation but wages of $576 which is consistent with her testimony that she worked at a camp that summer. Exhibits G–100 and 101.

ington until they purchased a house in 1994 in Richboro. Tr. 48:16–21.

12. Mrs. Lacheen agreed with the selection of the Richboro location because the schools were good but thought that the house, which was Mr. Lacheen's choice, was too big and too expensive. She disagreed with Mr. Lacheen's decisions to spend money on house improvements[7] and was concerned about the high house expenditures for the Richboro residence. However, he assured her that his practice was doing better and she should not worry. She deferred to his decisions but became concerned when the "money dried up" and they were living in a 3500 square foot house with no furniture in it. Tr. 48:20—50:5.

13. Mr. Lacheen admitted making the above and other nonessential purchases and "spending money frivolously" during the 1995 tax year. Tr. 11:16–12:6.

14. Mrs. Lacheen had a checking account in her name in 1995 and 1996. If she needed additional money she would ask Mr. Lacheen and he would put funds in her account. Tr. 52:14–20. The amount of those funds or how they were spent is unknown.

15. In 1995, Mrs. Lacheen received a settlement check from a lawsuit she brought and spent it shopping at Bloomingdale's. Tr. 30:6–11.[8]

16. From December 4, 1995 through August 5, 1996, the Lacheens spent $16,518 on multiple stock purchases as evidenced by Schedule D to their 1996 tax return. Exhibits G–101, Page 2 of Schedule D.[9] From March 13, 1996 through December 12, 1996, the Lacheens received proceeds of multiple stock sales aggregating $15,075 as also evidenced by Schedule D to their 1996 tax return. Id.[10]

17. During the 1995 and 1996 tax years, Plaintiffs made no estimated federal income tax payments. JPT, Uncontested Facts ¶¶ 5, 8, 9, 10.[11]

18. Mr. Lacheen's "modus operandi," dating back to when he first started practicing law 34 years ago and until recently, was never to make estimated tax payments, and only

---

7. For example, she wanted to join a swim club for the children but he insisted on installing a pool which then required costly landscaping. Tr. 49:5–13.

8. It appears the IRS discovered this fact from a records search which they put into evidence but without any testimony. Exhibit G–108. Mrs. Lacheen was not asked the amount of the settlement.

9. The purchases were as follows: $2,169 on shares of Imatron, Inc. on February 28, 1996, $6,960 on shares of Metromedia on December 4, 1995, $1,667 on shares of Polymedia Inds. on March 13, 1996, $5,004 on shares of "Samuel Goldwyn Co. on April 11, 1996, $718 on shares of Vimrx." Pharm on August 5, 1996. Id. Not included in this number are $500 on shares of Biosonics and $1,063 on shares of Viragen which are reflected as long term gains realized from sales in 1996 but no date of purchase is provided.

10. The dates and proceeds of stock sales were identified as follows: Imatron on 3/13/96 for $2,517, Metromedia on 12/12/96 for $4,079, Vimrx Pharm. on 10/10/96 for $663, Samuel Goldwyn on 4/11/96 for $4,333, Polymedia on 3/13/96 for $1,655, Biosonics on 10/10/96 for $695, Viragen on 4/10/96 for $1,133. Id.

11. The Lacheens were required to file quarterly Form 1040ES and make quarterly tax payments in 1995 and 1996. They failed to file and pay at each of the eight required times. Tr. 61:2–8, 62:17–63:3.

to send in as payment for taxes owing what he had available at the end of the year. *Id.* ¶ 6. Mrs. Lacheen was aware of Mr. Lacheen's practice not to pay estimated taxes. *See infra* note 21.

19. While the Lacheens owed $34,758 for taxes in 1996, when they filed their extension request, they estimated their tax liability for the 1996 year as $0. Exhibit 101, 64:12–25, 65:2.

20. Mrs. Lacheen deferred to Mr. Lacheen for all tax matters, did not discuss taxes with him and asked no questions when he submitted the tax return to be signed by her. Tr. 46:5–23. While the parties have stipulated that they were aware that no estimated payments were made, Mrs. Lacheen testified that she was unaware of his failure to pay estimated taxes.[12]

21. In addition to failing to pay estimated taxes for 1995 and 1996, the Lacheens failed to pay any taxes when they ultimately filed the returns in October 1996 (1995 return) and August 1997 (1996 return). Tr. 13–16, 64, Exhibits G–100, G–101.[13]

22. Mr. and Mrs. Lacheen both signed the 1995 and 1996 tax returns. Tr. 55:17–56:4, Exhibits G–100, 101.

23. After accounting for medical and dental expenses, state and local income taxes, real estate taxes, home mortgage interest, charitable contributions, and expenses on rental properties, the Lacheens had $175,382 of disposable income in 1995. Exs. G–100, 163. Tr. 60:12–19.

24. After accounting for medical and dental expenses, state and local income taxes, real estate taxes, home mortgage interest, charitable contributions, and expenses on rental properties, the Lacheens had $80,824 of disposable income in 1996. Exhibit G–101, 164, Tr. 63:15:12–25.

25. In 2005, the Lacheens listed nearly $14,000 of art pieces for sale on eBay, and these pieces were still part of their collection in 1995 and 1996. Tr. 39:8–18, Exhibit 19–29, JPT, Uncontested Facts at ¶ 11.[14]

26. When "little things" could not be paid for, Mr. Lacheen (*e.g.* the cable was shut off, there was no money for soccer shoes) finally admitted that the IRS had a tax lien. While Mrs. Lacheen could not remember what year this was, it ultimately led to the decision to put

---

**12.** *See infra* n. 21.

**13.** The taxpayers routinely took the automatic four month extension for filing the tax return, albeit without paying the tax as required, and one more so both returns were filed far into the next calendar year. *Id.*

**14.** The IRS points out that the Lacheens' bankruptcy schedules did not list this art or their stamp collection. When questioned about this omission, Mr. Lacheen stated that he did not disclose the assets because no one (*i.e.,* Diorio) had asked him the precise question when accumulating the data for the

schedules. The form Schedule B ¶ 6 asks this precise question and this testimony only goes to show how superficially the schedules were reviewed by both Debtors. As no one objected to the Debtors' discharge pursuant to § 727(a)(4), the relevance of this information was challenged. The IRS claims it goes to the Debtors' credibility and indicates that the Debtors had assets that could have been liquidated to pay their tax obligations in 1995 and 1996. I agreed it was relevant. Whether it evidences an intent to evade their tax obligation is discussed below.

the Richboro house up for sale. Tr. 50:14–25.[15]

27. Whether she first learned of the failure to pay taxes when she became aware of the their financial problems as stated above or when the IRS garnished her paycheck at summer camp, as Mr. Lacheen stated, this awareness appears to have occurred sometime in 1996.

28. The IRS records indicate that with respect to the 1995 taxes an estimated tax penalty, a failure to pay tax penalty and an assessment of interest were made and a tax lien imposed on November 25, 1996 and September 5, 1997, respectively. Exhibit G–138.[16]

## DISCUSSION

### A.

■ A central purpose of the Bankruptcy Code is to provide a procedure by which the poor but honest debtor can reorder his affairs, make peace with his creditors, and enjoy "a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). Accordingly, exceptions to discharge are strictly construed against creditors and liberally interpreted in favor of debtors. *Id.; United States v. Stelweck,* 108 B.R. 488, 495 (E.D.Pa.1989). Consistent with this policy, Debtors have been given every opportunity to prove their case, even as they repeatedly failed to fulfill the discovery obligations imposed by the rules of procedure and orders of this Court. Normally, the burden of proof in cases arising under 11 U.S.C. § 523(a)(1)(C) is on the government to prove by a preponderance of the evidence that the debtor willfully sought to evade the payment of taxes. But here, because of the Lacheen's failure to respond to the IRS's discovery requests, and Mr. Lacheen's inconsistent testimony about whether he possessed responsive documents regarding the expenditure of the couple's disposable income not devoted to tax obligations, I shifted the burden of proof to the Debtors. (September 18, 2006 Order, Docket #67.) Because the IRS was unable to discover how the Debtors spent their disposable income, the Debtors were charged with the burden of showing that they were unable to spend it to discharge their tax obligations.

15. As I noted at the trial, the chronology of these events was very ambiguous. For example, there is nothing in the record as to when the house which they bought in 1993 was put up for sale. I did learn that their move to a townhouse occurred in September 1997. Presumably the events animating the decision to move and the sale of the house preceded the move to the townhouse by some period. While the events occurred about ten years ago, one would have thought the dates could have been fixed with more precision. This type of vacuum in the record illustrates why I shifted the evidentiary burden in this case.

Mr. Lacheen characteristically could not recall whether he told Mrs. Lacheen about his failure to pay taxes. Notwithstanding that fact, he testified that he didn't think he did so. Tr. 17:23. He recalls that she was without knowledge until the IRS garnished her summer camp salary, an explanation that differs from that of Mrs. Lacheen. Tr.21:3–10. Mrs. Lacheen testified that she worked at the camp in the summers of 1995 through 1997.

16. When questioned about her knowledge of the IRS's collection efforts, Mrs. Lacheen stated that she did not read the mail delivered to the residence and that Mr. Lacheen had the mail delivered to his office. Since the IRS took no action on the 1995 unpaid taxes until November 25, 1996, the earliest she would have seen any notices had she examined the mail would have been in December 1996.

## B.

As I noted when this matter first came to me on summary judgment, the seminal case construing § 523(a)(1)(C) in this circuit is *United States v. Fegeley (In re Fegeley),* 118 F.3d 979 (3d Cir.1997).[17] Taking a plain language approach to § 523(a)(1)(C), the Circuit Court concluded that the provision included both a conduct requirement (*i.e.,* that the debtor sought in any manner to evade or defeat his tax liability) and a mental state requirement (*i.e.,* that the debtor did so willfully). *Id.* at 983.

### i.

Noting that Congress did not define or limit the methods by which a willful attempt to evade or defeat may be accomplished and giving weight to the inclusion of the phrase "in any manner," the *Fegeley* Court nonetheless held that a debtor's failure to pay his taxes, alone, does not satisfy § 523(a)(1)(C)'s exception to discharge in bankruptcy. *Id.* Rather it directed that "we should look to nonpayment of taxes as relevant evidence which [we] should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes." *Id.* (*quoting Dalton v. IRS,* 77 F.3d 1297, 1301 (10th Cir.1996)) (alteration in original). Moreover, it agreed with the majority of courts that have held that affirmative conduct designed to evade or defeat a tax is not required but that § 523(a)(1)(C) encompasses acts of culpable omission as well as acts of commission. *Id. See also In*

*re McGrath,* 217 B.R. 389, 393 (Bankr. N.D.N.Y.1997) (under the civil willfulness standard in 11 U.S.C. § 523(a)(1)(C) "there is no need to establish an affirmative act by the debtor or that the debtor possessed a 'bad purpose or evil motive.' ").

In this case there does not appear to be a serious contention that the Debtors' conduct evidenced an evasion of their duty to pay taxes. It was clearly established that both Mr. and Mrs. Lacheen had a duty under the tax law to pay their 1995 and 1996 taxes, knew they had a duty to do so and failed to discharge it when they had substantial income for that purpose. The focus of their defense is their *mens rea, i.e.,* whether their conduct was willful.

### ii.

With respect to the mental state requirement, the *Fegeley* Court concluded that willfulness requires a showing that the debtor's attempts to avoid his tax liability were voluntary, conscious and intentional.[18] *Fegeley* was found to have willfully attempted to evade or defeat his taxes by evidence that he had a duty to file income tax returns, knew he had that duty and voluntarily and intentionally violated it. He also had the financial ability to discharge the duty and failed to do so.[19]

█ Because a taxpayer is unlikely to admit an intentional evasion of his obligation to pay taxes, courts consider circumstantial evidence in determining willfulness. *United States of America v.*

---

**17.** Section 523(a)(1)(C) provides that a discharge under § 727 will not discharge a tax "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." Only the second prong of the subsection is implicated in this case, the IRS not contending that Debtors made a fraudulent return.

**18.** This standard derives from § 6672 of the Internal Revenue Code: "a debtor will be

considered to have willfully attempted to evade a tax if he acted voluntarily, consciously or intentionally or with reckless disregard for whether the tax has been paid." *See Schlesinger v. United States (In re Schlesinger),* 290 B.R. 529, 536 (Bankr.E.D.Pa.2002).

**19.** *Lacheen I,* 2005 WL 1155257, at *3. After a full trial the Debtors have still not answered that critical inquiry.

*Jacobs (In re Jacobs),* 2006 WL 2691516, at *15 (M.D.Fla. Sept.19, 2006). A survey of the case law indicates many factors relevant to a § 523(a)(1)(c) inquiry, only some of which need be present to find culpability. Such circumstantial evidence may include the debtor's conduct over a period of time which may extend beyond the time when the tax payment was due. *Id. See also United States v. Weiss,* 2000 WL 1708802, at *3 (E.D.Pa.2000).

Another such factor is the Debtor's manipulation of the voluntary tax system by failing to make estimated payments toward anticipated tax liabilities and failing to pay taxes due when concurrently seeking the automatic filing extension.[20] As noted by the court in *In re Ripley,* 926 F.2d 440 (5th Cir.1991):

> the government relies primarily upon employers to collect income and Social Security taxes from their employees. Employers collect these taxes through the customary withholding mechanism. However, in the case of a self-employed individual such as Ripley, withholding is inapposite. Such persons must use the estimated tax procedure, which simulates withholding by requiring taxpayers to remit payments to the IRS throughout the year.

*Id.* at 446. The purpose of these alternate "escrowing" procedures is to ensure that taxpayers will not exhaust their income before the tax thereon becomes due. Courts have found that the failure to make voluntary payments toward tax liabilities by submitting to employer withholding tax procedures is evidence of an intention not to pay taxes. *See e.g., Tudisco v. United States of America (In re Tudisco),* 183 F.3d 133, 137 (2d Cir.1999); *Blakeman v. United States of America (In re Blakeman),* 244 B.R. 100, 103 (Bankr.N.D.Ohio

1999). While these taxpayers accomplished this end by submitting false W–4 forms to their employers so as to appear to be exempt from the required withholding, a self-assessed taxpayer who simply does not pay or underpays based on his assessment of what he can afford is no less culpable. *E.g., Steinkrauss v. United States of America (In re Steinkrauss),* 313 B.R. 87, 98 (Bankr.D.Mass.2004). *See also Landi v. United States of America,* 316 B.R. 363, 369–70 (M.D.Fla.2004) (if doctor considered himself an independent contractor, he was required to file estimated tax returns and pay; if he considered himself an employee of the professional corporation, he was required to withhold and pay payroll taxes on quarterly returns; his failure to do either is relevant to his intent).

When the failure to pay the withholding or estimated tax is combined with an improper use of the filing extension procedure, evidence of intended tax avoidance is stronger. The prescribed procedure for payment of taxes is described by the court in *Jacobs v. Commissioner,* T.C. Memo. 1994–252, 1994 WL 243470 (U.S.Tax Ct.1994):

> Individuals who compute their taxes on a calendar year basis must file an income tax return by the 15th day of April following the close of the taxable year. Sec. 6072(a). Nevertheless, individual taxpayers may obtain an automatic 4–month extension of time to file their return. Sec. 1.6081–4(a)(1), Income Tax Regs. In order to obtain the automatic extension, a taxpayer must file a signed Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return. Sec. 1.6081–4(a)(2), Income Tax Regs. The applica-

---

**20.** While these are also probative of the conduct requirement, they may also evidence a conscious attempt to evade the payment of the taxes.

tion must be filed on or before the due date prescribed for filing the taxpayer's return. Sec. 1.6081–4(a)(3), Income Tax Regs. Section 1.6081–4(a)(4), Income Tax Regs., provides that the application:

> must show the full amount properly estimated as tax for such taxpayer for such taxable year, and such application must be accompanied by the full remittance of the amount properly estimated as tax which is unpaid as of the date prescribed for the filing of the return.

*The mere fact that a timely application for extension has been filed does not serve to extend the time for payment of any tax due on such return. Thus, regardless of whether a taxpayer has been granted the extension, all taxes properly estimated as due are still required to be paid on the original due date of the return.*

*Id.* at \*2 (emphasis added). While it would not be possible to know the actual amount due until the return is completed, taxpayers are charged with making a bona fide and reasonable estimate of tax liability based on the information available at the time of the extension request. *Id.*

The taxpayers in *Steinkrauss* compounded their wrongdoing of underpaying their estimated taxes by taking the auto-matic filing extension without paying the amount due. The court found that the payments they made were more of an attempt to placate the IRS than to notify them. 313 B.R. at 99. In *In re Jacobs*, the Court found that Mr. Jacobs always filed his tax returns but they were chronically late, noting that in each year in question he requested two extensions giving him until October 15 of the following year to file. This pattern was evidence of an affirmative act to evade the assessment and payment of taxes which were ultimately excepted from discharge pursuant to § 523(a)(1)(C). 2006 WL 2691516, at \*11.

■ In this case, Mr. Lacheen, who was responsible for handling the couple's taxes, admitted he knew about the estimated payments but elected not to make them. Rather he chose to pay when his returns were filed to the extent of his available income and incur the requisite penalty for his violation of the quarterly estimation payment requirement. 26 U.S.C. § 6654. Mrs. Lacheen was aware of this practice and discussed it with Mr. Lacheen when they were married. While Mrs. Lacheen denies such knowledge, at best it appears that her ignorance is of her own making since she never asked and he never told whether he continued to fail to estimate.[21]

---

**21.** The Lacheens stipulated in the Joint Pre–Trial Statement that they both were aware, during 1995 and 1996, that no estimated tax payments were being made as required by federal law. Such stipulations are binding and contrary testimony should be disregarded. *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir.1998). Plaintiffs' counsel seeks to attribute this admission to former counsel Diorio. Mr. Lacheen is an attorney and well aware of the binding nature of a pretrial stipulation. Notwithstanding their attorney's attempt to continue to shift blame to Diorio, the Lacheens never contended that they did not review the JPT or that Diorio's presentation of the uncontested facts was erroneous. However, even if the stipulations were not binding, a fair reference from the presented evidence is that notwithstanding her blanket denial of such knowledge, Mrs. Lacheen was aware that Mr. Lacheen did not make estimated tax payments. Her testimony on this subject, like others, was that they simply did not discuss it. This would have corroborated Mr. Lacheen's testimony that he had no recollection of telling her about this practice when they married, Tr. 24:17–23, but for his deposition testimony to the contrary. At his deposition he revealed that when he and Mrs. Lacheen married, she questioned the economics of his practice of not paying estimated taxes and suggested that he pay on time so he wouldn't incur penalties and interest on the overdue amounts. Tr. 26:7–27:18.

I find not credible both parties' denial of Mrs. Lacheen's knowledge of his failure to pay estimated taxes in 1995 and 1996. If Mrs. Lacheen did not actually discuss the payment of estimated taxes in 1995 and 1996, she had reason to question whether they were being made given her knowledge of his long practice not to do so. Every year she signed a tax return which would clearly indicate that estimated payments were not made. She never said and I find it inconceivable that she could state that she never looked at the bottom line of their tax returns to see what they owed the IRS. As the evidence establishes the existence of disposable income during the relevant tax years, and especially in 1995, its depletion without reservation for payment of taxes when due, is probative of a willful evasion of taxes.

Moreover the routine practice of applying for extensions that are automatically granted further evidences an avoidance of the payment obligation since no payment accompanied the extension request as required. Indeed the Form 4868 for 1996 falsely indicates no tax liability for that year. Exhibit G–101. Given the Lacheens' 1996 adjusted gross income of $152,697 and ultimate tax liability of $36,608, it is fair to assume that when the extension request was made after the conclusion of the calendar year some tax liability was apparent. Thus, the tax liability estimate that accompanied the form was neither bona fide nor reasonable. If anything, it appears to be an attempt to ride under the radar of the IRS. While not specifically questioned about this submission to the IRS, I conclude that it is unlikely that Mrs. Lacheen had any complicity in the filing of the extension request form or perhaps knowledge that the taxes had to be paid on April 15 without regard to the automatic extension for filing the return since she was not involved in the payment of the couples' taxes.

A further indicia of an intent to evade payment of taxes is drawn from evidence that the taxpayer had the financial resources to pay but simply did not. In *Fegeley*, the Third Circuit observed that the taxpayer's failure to discharge his known duty to file returns along with his financial ability to discharge that duty were sufficient to prove a willful attempt to evade or defeat his taxes. 118 F.3d 979. Even where the returns are filed, the failure to pay the IRS because available income has been directed to other, often non-essential purchases is sufficient to preclude a discharge under § 523(a)(1)(C). *E.g., In re Jacobs*, 2006 WL 2691516 at *13 ("lavish spending in the face of mounting tax debt also demonstrates conduct designed to evade or defeat a tax"); *Hassan v. United States*, 301 B.R. 614, 622–24 (S.D.Fla.2003) (taxpayers who left significant tax liabilities unpaid while they enjoyed a profligate lifestyle had not proven themselves to be the poor but honest debtors for whom the fresh start is intended). The bankruptcy law distinguishes between the debtor with the present ability to pay and does not do so and the unfortunate debtor without a present ability to pay. In *In re Angel*, 1994 WL 69516, at *4 (Bankr. W.D.Okla.1994), the court explained the difference:

> Debtors with an inability to pay their taxes with no more culpability will have their tax debts discharged. However, debtors who have cash in hand and, instead of responding to their tax obligations, choose to pay other creditors or purchase luxury items and expensive homes will have their debts excepted from discharge.

This is precisely what the Lacheens did.

With respect to 1995, Mr. Lacheen has acknowledged that lavish non-essential purchases aggregating at least $67,000

were made that year in derogation of the parties' obligations as taxpayers.[22] While never totally accounting for the depletion of $175,000 of disposable income after medical and dental, state and local income and real estate taxes, home mortgage interest, charitable contributions and rental property expenses were deducted from adjusted gross income, the IRS has proven that at least $67,000 of the $79,000 in taxes owed that year could have been paid but for those expenditures. It is also fair to assume given the Lacheens' 1995 adjusted gross income of $274,000, that there were sufficient financial resources to pay the remaining $12,000 of taxes. Plaintiffs do not appear to contest this conclusion.[23]

With respect to 1996, there is no evidence in this record from which I can glean what happened to $80,824 of 1996 disposable income after accounting for various big-ticket expense items like medical care, home mortgage interest, expenses for rental properties, and state and local taxes, and why absolutely none of it was directed to the Lacheens' tax liabilities. Again it was the Plaintiffs burden to prove that they did not channel these funds to other priorities to the exclusion of the government.

Plaintiffs argue that the failure to pay the taxes in 1996 can be attributed to Mr. Lacheen's drop in income. They argue that there is no evidence of non-essential purchases in 1996 because there were none, and I should accept Mr. Lacheen's

testimony that he didn't make the payments because he didn't have the money. Plaintiffs' argument begs the question as to what happened to the $80,000 of disposable income not dedicated to necessities. While the $80,000 figure may not be precise since it was drawn from the tax return (the only record the IRS had), the Plaintiffs produced no evidence to refute it. Given Mr. Lacheen's memory which is at best flawed and at worst convenient, I do not find credible his conclusory statement that they made no payment because they had no money. *See Gardner v. United States of America (In re Gardner)*, 360 F.3d 551, 561 (6th Cir.2004) (court not required to accept self-serving testimony, even if uncontradicted, if it finds the testimony improbable, unreasonable or questionable). While that may ultimately have been true by the time the 1996 return was filed in 1997, it too begs the question as to why. Where did the money go? In *Hassan*, the court found that the absence of an adequate explanation or justification for the failure to pay taxes even though the taxpayers had significant income was a factor evidencing willful conduct. Like the Lacheens, the Hassans had inadequate records, another circumstantial indicia of their intent. 301 B.R. at 624. And like this case, Mr. Lacheen's lack of credibility arising from his inconsistent testimony concerning the availability of records, the Plaintiffs' absence of any effort to secure or recreate them from other sources[24] and

---

22. Of the $79,004 in taxes due for 1995, approximately $67,000 is accounted for by the pool, window coverings, and patio deck. Part of the balance is attributable to the European vacation for which no cost was fixed.

23. Mr. Lacheen does not contend that they did not have the funds to pay the 1995 taxes. Plaintiffs appear to concede that they cannot justify their excessive 1995 spending and do not ask me to revisit my conclusion reached on summary judgment concerning the IRS's

satisfaction of the *Fegeley* standard as to Mr. Lacheen. Rather their Post-trial Memorandum seeks to refute Mr. Lacheen's liability for 1996 taxes and Mrs. Lacheen's liability for both years as an "innocent spouse."

24. In *Weiss*, the court discounted the debtor's defense of stolen records by noting the absence of any evidence that he had sought to acquire duplicate records from other sources. 2000 WL 1708802, at *3.

failure to be able to explain with any specificity why their did not pay the IRS in 1996, is a barrier to accepting his bare protestations of financial duress.

Plaintiffs' counsel argues that the $80,000 should be reduced by other necessary expenditures that would not ordinarily be captured by a tax return such as mortgage principal, food and clothing. In the absence of providing the requested evidence to the IRS concerning their 1996 expenses, it was Plaintiffs' burden to prove by competent evidence how they depleted their joint 1996 income of $152,699 to the point there was nothing available to pay the IRS. They failed to do so, and I will not speculate based on their counsel's argument that they spent money on necessities.[25] Moreover, I have to inquire as did the IRS why, if there was no money to pay the 1996 taxes, at least five stock purchases were made from December 4, 1995 to August 5, 1996. Clearly they had approximately $18,000 to invest from December 1995 to August 2006 that could have been used for taxes. Moreover they had a second chance to direct this money to taxes when they sold the securities generating approximately $15,000 from March 2006 to December 2006. Had this been done almost half of the 1996 tax obligation would have been satisfied. Moreover, had Plaintiffs intended to pay the remaining 1996 tax obligation, they had only to sell the undisclosed art collection, which Mr. Lacheen was prepared to sell after they filed bankruptcy.[26] Thus, as to the question that remained after the summary judgment decision, I conclude that the tax debt for both 1995 and 1996 is not dischargeable, at least as to Mr. Lacheen.

### C.

While the failure to pay the 1995 and 1996 taxes was clearly a voluntary, conscious and intentional act on the part of Mr. Lacheen who controlled the finances, it remains to be seen whether that mental state can also be attributed to Mrs. Lacheen. The primary focus of the Plaintiffs' Post-trial Memorandum is to absolve Mrs. Lacheen from continued liability for the unpaid taxes by distinguishing her mental state from that of Mr. Lacheen. Stated another way, are there facts in this record which would establish that the failure to pay these taxes was not a conscious decision by Mrs. Lacheen as well. Section 523(a)(1)(C) "encompasses acts of culpable omission as well as acts of commission." *Fegeley*, 118 F.3d at 983. Thus, the fact that Mr. Lacheen undertook responsibility for the family finances and tax payments does not insulate Mrs. Lacheen from liability without more.

■ Based on all the evidence, I conclude that Mrs. Lacheen cannot be found to have willfully evaded payment of the 1995 taxes. She credibly testified that throughout their marriage Mr. Lacheen handled tax compliance as well as all the family financial matters while she raised their three children. She was also attending college.[27] Meanwhile Mr. Lacheen gave her money as she needed it and as he had it. She used her own checking ac-

---

**25.** I don't understand why there was no attempt to prove any of these expenditures. Given the amount of time this case was pending, the notice that Plaintiffs had of their disclosure obligations and the consequence of their failure to muster any proof, the absence of evidence requires the conclusion I have drawn.

**26.** The concealment of assets is one badge that may evidence a willful evasion or defeat of taxes under § 523(a)(1)(C). *Lewis v. Internal Revenue Service (In re Lewis)*, 151 B.R. 140, 146 (Bankr.W.D.Tenn.1992); *In re Jones*, 116 B.R. 810, 814 (Bankr.D.Kan.1990).

**27.** She ultimately earned a master's degree in education and her financial independence.

count into which he made deposits for her expenditures. While it appears that she was aware that he had cash flow problems from time to time, she was totally dependent upon him and accepted without opposition his financial decisions.

Although Mrs. Lacheen and the children enjoyed the benefits of the 1995 nonessential purchases, including a 1995 trip to Vienna, he was the one who made these spending decisions. At times she disagreed with his use of his income. For example, when she suggested joining a swim club, he insisted on installing a $50,000 pool with fence and landscaping. When she wanted to live in Richboro for the school system, he selected a very large house and lot that was costly to maintain. However, in the final analysis, she acquiesced to his decisions, being assured that his law business was doing better (and it was), and the purchases were affordable. He continued to manage their finances with no opposition as he had done through all the years of their marriage. A subject like taxes was never even discussed.[28] Nor does it appear that she had notice of the tax problems at this time. She denied being aware of any tax problems through receipt of notices from the taxing authorities, and the IRS provided no evidence that it had transmitted any notices that would have put her on notice at the relevant time.[29] Indeed it appears that because the 1995 taxes were not filed until October 1996, the IRS did not generate an assessment or penalty until November 1996. Exhibit G–138. While I have concluded that she was aware of Mr. La-

cheen's practice not to pay estimated taxes, she had no reason in 1995 based on his assurances and the spike in income that he experienced to suspect that he would not be able to pay the taxes, albeit with penalty and interest, when they came due.[30] For these reasons, I cannot conclude that Mrs. Lacheen had the mental state to have willfully evaded the payment of 1995 taxes.

■ I cannot reach the same conclusion with respect to the 1996 tax obligation. While 1995 was an exceptional year for Mr. Lacheen, the year that followed was not. There were many indications that, in her own words, the "money dried up." She wanted furniture for the house but he could not buy it having spent large sums on the pool, landscaping and other house improvements. She still did not inquire about their tax obligations or how he was handling their money. When she signed the 1995 tax return as requested by her husband in 1996, she did so with personal knowledge of the family's financial problems. The return showed a tax owing of $80,000 and confirmed that no estimated payments had been made. She still did not ask him how he was going to discharge this large liability or what they were doing about the current years taxes.

There is reason to believe that Mrs. Lacheen could have influenced Mr. Lacheen's behavior, as she did when she convinced him to move to the suburbs in 1993, and ultimately "fired" him as the manager of family funds.[31] The important fact is that she did not try but rather maintained a purposeful ignorance of the financial

---

**28.** When asked what her impression was as to their tax obligations in 1995, she stated she had none.

**29.** Thus I need not determine the credibility of her answer that she wouldn't see notices because she never looked at the mail and that the mail was sent to her husband's office.

**30.** He apparently had done so in 1994 judging from the answer of the IRS to the Complaint that there were no unpaid taxes for that year.

**31.** This admission was made during her deposition but was contradicted at trial when she was represented by a different lawyer.

realities with regard to the taxes where there were red flags that should have alerted her to the problem. In *Steinkrauss v. United States of America (In re Steinkrauss)*, 313 B.R. 87 (Bankr.D.Mass. 2004), the wife taxpayer made the same argument as made here by Mrs. Lacheen. The Court was not impressed, concluding that Mrs. Steinkrauss was college educated, raised six children and "became a very successful breadwinner despite her attempts to characterize herself as the innocent spouse." *Id.* at 98. She acknowledged that she knew her duty to file tax returns. She participated in the couple's investments.

Mrs. Lacheen similarly appeared to me as an intelligent and capable woman. She has resolutely completed her college education to become a special education teacher while raising three children.[32] While she was young and inexperienced when she married Mr. Lacheen, many years her senior, I found no indication that during the relevant tax years she was implicitly or explicitly coerced to follow his lead in financial matters. Although she was assured that Mr. Lacheen had the income to make the 1995 house expenditures, he never represented that he had paid the estimated taxes on it and she knew of his penchant not to do so. While she could

have believed that his increased income would have been sufficient to satisfy these taxes, by 1996 that belief would have been without foundation. He did not hide or misrepresent their 1996 tax situation. He did not tell her it was none of her business. Rather she chose not to discuss the matter, not even when she was not asked to sign the 1995 return in April 1996 or ultimately when he placed that return before her showing a joint liability for 1995 of in excess of $80,000. Rather Mrs. Lacheen had a curious apathy regarding the tax problem, almost as though it had nothing to do with her since it was Mr. Lacheen's income that generated the tax liability.[33] Even in the context of "innocent spouse" cases to which the Plaintiffs urge me to refer,[34] it is clear that there is a duty of inquiry and failure of that duty precludes the requisite finding that the spouse had no reason to know of the understatement on the return and granting of innocent spouse status. *Michaud v. United States of America*, 206 B.R. 1, 6 (D.N.H.1997) (*quoting Erdahl v. Commissioner of Internal Revenue*, 930 F.2d 585, 589 (8th Cir. 1991)) ("innocent spouse exception is 'designed to protect the innocent, not the intentionally ignorant' ").

Finally I note again that because the Lacheens produced no documents that evi-

---

**32.** She has been working for the Philadelphia School Board since 1999 and was earning $54,000 per year in 2004 when the bankruptcy case was filed. Exhibit G–162.

**33.** That apathy apparently also extended to her bankruptcy schedules which she signed under penalty of perjury much as she signed the tax returns without question. Those schedules omitted the art and stamp collection.

**34.** To qualify for the narrow exception to a spouse's liability for joint tax obligations four criteria must be satisfied: (1) a joint return must be filed for the year in question; (2) there were substantial understatements of tax

attributable to grossly erroneous items of her spouse in the return; (3) in signing the return, she did not know or have reason to know of the substantial understatements; and (4) taking into account all the facts and circumstances, it would be inequitable to hold her liable for the deficiencies and additions to the tax. *Silverman v. Commissioner of the Internal Revenue*, 116 F.3d 172, 173–74 (6th Cir.1997). It is clear that the instant case does not involve understatements of taxes but rather the failure to pay taxes. Unlike the innocent spouse who does not have any basis to know whether the tax return is correct, Mrs. Lacheen had only to ask her husband for evidence that the taxes were being paid.

denced their spending, I shifted the burden to them to prove by a preponderance of the evidence that they had not consciously evaded payment of her 1995 and 1996 taxes. Yet there was nothing in Mrs. Lacheen's testimony that provided an evidentiary basis to conclude that she had met her shifted burden with respect to the 1996 taxes.[35] She proffered no evidence regarding her 1996 spending. I do not know how much money Mr. Lacheen deposited in her checking account nor how she spent it. She failed to address her knowledge or involvement in the couple's 1996 stock investments which was identified on the 1996 tax return.[36]

In short I am no more persuaded than the Court in *Steinkrauss* that what both taxpayers describe as a "division of labor," does not without more present a legal basis to exonerate the spouse who does not actually handle the taxes. This delegation is contrary to the law when a spouse signs a joint tax return. While the income and her husband's assurances were sufficient in 1995 to negate an intention on her part to evade her tax obligation, she was sufficiently on notice by 1996 that remedial steps needed to be taken to ensure that they would have sufficient funds to discharge their tax debt. Her "innocent spouse" type defense is unavailing to relieve her from liability for the 1996 taxes that I have found not to be dischargeable.

## CONCLUSION

For the reasons stated above, I conclude that Jerome Lacheem has not satisfied his burden to prove that he did not willfully attempt to evade the payment of their 1995 and 1996 federal income taxes. Likewise I find that Ann Lacheen has not satisfied her burden to prove that she did not willfully attempt to evade the payment of their 1996 federal income taxes. Accordingly these tax obligations are excepted pursuant to 11 U.S.C. § 523(a)(1)(C) from the discharge otherwise granted in this Chapter 7 case.

### ORDER

**AND NOW,** this 20th day of March 2007, upon consideration of the Complaint of the Debtors Jerome and Ann Lacheen to determine the dischargeability of federal income taxes pursuant to 11 U.S.C. § 523(a)(1); after trial and consideration of the parties' memoranda, and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that judgment is entered in favor of the Internal Revenue Service and against Jerome Lacheen for tax years 1995 and against Jerome and Ann Lacheen for tax year 1996. The obligation of Ann Lacheen for 1995 taxes is discharged.

**35.** Contrary to the selected portions of testimony that Plaintiffs highlight in their brief, I find Mr. Lacheen's testimony about what he did and did not tell Mrs. Lacheen and when she learned of certain dispositive matters unreliable and self-serving.

**36.** I stress that the traditional burden placed on the taxing authority to prove by a preponderance of the evidence that the taxes are not dischargeable was shifted to the Debtors. I do so because the conclusion to hold Mrs. Lacheen liable might have turned out differently had the burden not been shifted.